OPINION
 

 By the Court, Rose, J.:
 

 In this appeal, we decide whether the district court’s dismissal of multiple jury venires was error, whether a subsequent venire cured those errors, and whether the district court erred when it allowed the State to impeach the defendant regarding a conviction for a crime committed when he was seventeen years old.
 

 After a trial, a jury selected from the third venire convicted Gary Jerome Williams of the battery of Robin Swope. Before trial, the district court denied Williams’ motion to suppress his conviction for aggravated robbery, which occurred in 1985 when he was a juvenile. During jury selection, the district court dismissed the first venire because it did not reflect the racial makeup of Clark
 
 *937
 
 County, Nevada. As a remedy, the district court directed the jury commissioner to specifically include African Americans in the next venire. The district court dismissed the second venire because the State was concerned over the randomness of the venire’s selection since three of the first twelve jurors were African Americans. Neither Williams nor the State objected to the composition of the third venire.
 

 We conclude that the district court erred when it dismissed the second venire because no evidence in the record establishes that the second venire was not randomly selected and because the State’s objection reveals a racial motive for dismissing the venire. The district court’s order for a third venire was insufficient to cure the State’s racial bias present in the dismissal of the second venire. We also conclude that the district court abused its discretion in allowing the State to impeach Williams with his conviction when he was a juvenile. Therefore, we reverse and remand for a new trial.
 

 FACTS
 

 On June 22, 2003, Robin Swope, a male Caucasian, and Gary Jerome Williams, a male African American, were involved in an altercation in and around the parking lot of the Wild Wild West Casino-Motel in Las Vegas, Nevada. Swope and his children were staying at the motel that night. Swope confronted Williams after he saw Williams speaking with Swope’s thirteen-year-old daughter. Details of the altercation were highly disputed at trial, including who was the first aggressor, who produced a knife with an emblem of a confederate flag, and whether Swope called Williams a “nigger.”
 

 Williams was arrested and charged with attempted murder with use of a deadly weapon and battery with use of a deadly weapon resulting in substantial bodily harm. Following trial, a jury selected from the third venire found Williams guilty of battery with use of a deadly weapon resulting in substantial bodily harm.
 

 Williams
 
 ’
 
 prior felony conviction
 

 Before trial, Williams moved to exclude his 1985 felony conviction for aggravated robbery. Williams was seventeen years old at the time of his conviction in an Arkansas circuit court. The presen-tence report issued by the Nevada Department of Public Safety lists the offense as a juvenile offense. Williams was sentenced to fifteen years of confinement and was paroled but was subsequently returned to prison. The district court denied Williams’ motion to exclude his conviction but did not address whether it was a juvenile conviction.
 

 
 *938
 

 Jury selection
 

 The first venire
 
 [1]
 
 included only one African-American person out of forty veniremembers. Clark County, Nevada, contains 9.1% Black or African-American people.
 
 [2]
 
 Williams moved to strike the first venire because it did not adequately represent a cross section of the community. The State did not oppose the motion, and the district court dismissed the first venire.
 

 A meeting was then held in chambers between the court and counsel. During the meeting, the court telephoned the jury commissioner, who assured the district court that a “randomly reconstituted” venire would be sent up that more adequately represented the African-American cross section of the community. According to the record, the court talked to the jury commissioner a second time to ensure that the second venire would be randomly selected. The record does not reflect what was said between the court and the jury commissioner. However, according to the statements of counsel and the court, the second venire contained a “specific inclusion of African-Americans.” The court provided the following explanation:
 

 Counsel . . . were concerned about the new panel, that it might not be randomly selected. And so, the Court called back down to the Jury Commissioner, and the Jury Commissioner told the Court that, yes, it would be randomly selected, but the five or six African-Americans that were in the entire juror group downstairs would be put into this panel and then it would be randomly selected.
 

 The second venire contained six African Americans, three of whom were among the first twelve jurors. The State was aware of the method, “specific inclusion,” that the jury commissioner was going to use to prepare the second venire. Once the second venire was seated, the State moved to dismiss the venire because it objected to the perceived lack of randomness in the second venire. The State explained:
 

 We just don’t feel that it was random. We had three African-Americans in the first twelve. And we had talked about in chambers that we thought that normally [the number of African Americans in the jury venire is] around three to five, and all of a sudden we had six and we had three in the first twelve. So, we don’t think — we feel that it wasn’t completely
 
 *939
 
 random, therefore we are asking for a more random selection tomorrow, which would be a fresh start.
 

 In response, Williams objected and sought to have the jury commissioner testify to provide a record of the jury selection process for the second jury venire. However, a record was not made. The district court granted the State’s motion.
 

 The third jury venire contained three African Americans out of forty veniremembers. No objections were made to the third venire. Jury selection proceeded, and one African American sat on the jury that convicted Williams.
 

 DISCUSSION
 

 On appeal, Williams argues that dismissing the second venire was error because the specific inclusion of African Americans in a venire is permissible when necessary to prevent discrimination and to ensure a fair cross section of the community. He also argues that the State’s motion to excuse the second venire amounted to an attempt to exclude African Americans from serving on his jury in violation of
 
 Batson v.
 
 Kentucky,
 
 [3]
 
 Finally, he argues that the district court erred when it allowed the State to impeach him with a conviction for aggravated robbery that occurred when he was a juvenile.
 

 Dismissal of the second venire
 

 The events leading to the dismissal of the second venire begin with Williams’ motion to dismiss the first venire. Williams moved to dismiss the first venire because it contained only one African American out of forty veniremembers. He claimed that the first venire violated his Sixth Amendment right to a jury composed of a fair cross section of the community.
 
 [4]
 
 The State did not object to the motion, and the district court dismissed the first venire.
 

 A fair cross section of the community
 

 Williams is entitled to a venire selected from a fair cross section of the community under the Sixth and Fourteenth Amendments of the United States Constitution.
 
 [5]
 
 The Sixth Amendment does not guarantee a jury or even a venire that is a perfect cross section of the community. Instead, the Sixth Amendment only requires that “ ‘venires from which juries are drawn must not systematically ex-
 
 *940
 
 elude distinctive groups in the community and thereby fail to be reasonably representative thereof.’ ”
 
 [6]
 
 Thus, as long as the jury selection process is designed to select jurors from a fair cross section of the community, then random variations that produce venires without a specific class of persons or with an abundance of that class are permissible.
 

 To demonstrate a prima facie violation of the fair-cross-section requirements, the defendant must show:
 

 “(1) that the group alleged to be excluded is a
 
 ‘distinctive’ group
 
 in the community; (2) that the
 
 representation of this group in venires
 
 from which juries are selected
 
 is not fair and reasonable
 
 in relation to the number of such persons in the community; and (3) that this underrepresentation is
 
 due to systematic exclusion
 
 of the group
 
 in the jury-selection process.”
 

 [7]
 

 Although the district court did not evaluate Williams’ argument that the first venire violated his Sixth Amendment rights, Williams did meet the first two prongs of the test. First, the group allegedly excluded, African Americans, is a distinctive group in the community.
 
 [8]
 
 Second, the representation of this group in the first venire was not fair and reasonable in relation to its representation in Clark County.
 
 [9]
 
 However, Williams introduced no evidence to show that Clark County systematically excludes African Americans from the jury selection process.
 

 Systematic discrimination
 

 Williams uses
 
 Brooks v. Beto
 

 [10]
 

 to support his argument that specific inclusion is the appropriate remedy to cure systematic dis
 
 *941
 
 crimination. However, the Fifth Circuit in
 
 Brooks
 
 faced a much different factual situation than we do today. In
 
 Brooks,
 
 no African Americans had ever served on a grand jury.
 
 [11]
 
 Yet, the demographic makeup of the county was 10% African American, indicating a strong tradition of discrimination in that court system. The Fifth Circuit recognized the paradox of allowing the jury selection system to continue as is while attempting to fix the system, thus producing more unconstitutional grand juries, as opposed to allowing the specific inclusion of African-American jurors to achieve fair and constitutional grand juries.
 
 [12]
 
 The Fifth Circuit upheld the practice of specific inclusion of African Americans to remedy the flaws in the jury system.
 

 In contrast, Williams demonstrates no history of discrimination and presents no facts indicating that the jury selection process in Clark County systematically discriminates against African Americans. The district court stated that, on average, three (7.5%) to four (10%) African Americans are present in a forty-person venire. This reflects the percentage of African Americans in Clark County (9.1%). The third prong of the Sixth Amendment’s guarantee requires systematic discrimination. The Sixth Amendment allows variations based on chance. Even in a constitutional jury selection system, it is possible to draw venires containing no (0%) or one (2.5%) African American in a forty-person venire. It is equally possible that the same venire could contain six (15%) to eight (20%) African Americans. Such variations are normal in a constitutional system.
 

 Even though the variations in Williams’ venires
 
 [13]
 
 are normal in constitutional systems and appear to indicate the health of the jury selection system in Clark County, several recent articles in the
 
 Las Vegas Sun
 
 indicate problems in the jury selection process.
 
 [14]
 
 The articles question whether the jury selection process adequately represents the diverse population of Clark County. While we have no data before us to indicate otherwise, the articles indicate that the
 
 *942
 
 jury selection process may not represent an adequate cross section of the community.
 

 While Clark County’s Jury Commissioner is correct that “[a] jury of one’s peers is simply a ‘randomly selected cross section of the members of your community,’ ”
 
 [15]
 
 this constitutional guarantee is not satisfied by blindly following statutory mandates. “To fairly represent the community, there must be an awareness of the makeup of that community.”
 
 [16]
 
 Therefore, jury commissioners should be cognizant of the makeup of their community,
 
 [17]
 
 should compare this with the makeup of the lists used in the jury selection process and the resulting jury pool,
 
 [18]
 
 and should strive to create lists of prospective jurors that represent an accurate cross section of the community.
 

 In the present case, however, there is no evidence before us to indicate that the jury selection process in Clark County systematically excludes African Americans from its jury selection process. Therefore, we conclude that Williams has not suffered a violation of his Sixth Amendment rights because the first venire did not violate his right to a venire composed of a fair cross section of the community. Nevertheless, the State did not object to Williams’ motion, and the district court dismissed the first venire and instructed the jury commissioner to specifically include African Americans in the second venire to remedy the perceived violation.
 

 Whether specific inclusion of a distinctive class can be used as a remedy where no constitutional violation has been found is an
 
 *943
 
 issue of first impression in Nevada.
 
 [19]
 
 We review questions of law de novo.
 
 [20]
 

 Specific inclusion of a distinctive class
 

 Williams argues that the specific inclusion of a distinctive class in a venire is permissible when necessary to prevent discrimination. Specific inclusion, or infusion, of individuals into a venire is the practice of selecting individuals in the jury pool who meet specific criteria and purposely placing them into a venire. In the case of racial underrepresentation in a jury pool, specific inclusion is accomplished by visually observing individuals or asking them about their race, selecting enough individuals of a specific race to assure a fair cross section of the community, placing those individuals into the venire, and then randomly constituting the remaining portion of the venire. Some courts have approved this practice to achieve a racially balanced venire and avoid any constitutional infirmity.
 
 [21]
 

 However, Williams has not demonstrated any constitutional infirmity and a venire that is constituted by specifically including certain individuals is not random. Nevada law requires trial juries to be selected randomly,
 
 [22]
 
 and a district court cannot substitute its own judgment for that of the Legislature as to how best to compose a venire.
 
 [23]
 
 Therefore, we conclude that specific inclusion of distinct classes in a venire is not allowed in Nevada unless done to correct a specific constitutional violation. Consequently, the district court’s instructions to the jury commissioner to specifically include African Americans in the second venire constituted error.
 

 Further compounding its error, the district court made no finding of fact as to what the jury commissioner actually did to constitute the second venire. The record contains no direct evidence that the jury commissioner complied with the district court’s instructions and specifically included African Americans in the second venire. To establish a violation of the randomness requirement, the district court should have heard testimony from the jury commis
 
 *944
 
 sioner regarding how the venire was constituted, something Williams requested. Therefore, because adequate evidence of specific inclusion is not present in the record, we conclude that the district court erred in dismissing the second venire.
 

 The appropriate remedy for a venire that is not randomly constituted, and an appropriate remedy for the district court’s error in dismissing the second venire, is to grant Williams a new venire. The district court gave Williams a third venire, which Williams does not contest was randomly constituted and which contained a fair cross section of the community. Thus, Williams has already received his remedy for these errors.
 

 However, the State’s motion to dismiss the second venire contained racial remarks and is subject to challenge under
 
 Batson v.
 
 Kentucky.
 
 [24]
 
 Absent evidence that the second venire was not randomly constituted and thus validly dismissed, we must consider whether the State’s motion to dismiss the second venire violated
 
 Batson.
 

 Discrimination under Batson
 

 Applicability of Batson to the dismissal of the second venire
 

 Williams argues that the State’s action in seeking to excuse the second venire shows that the State sought to exclude African Americans from the jury in violation of
 
 Batson.
 
 The State claims, and the district court held,
 
 that Batson
 
 is inapplicable because (1) the second venire was dismissed because the jury commissioner did not randomly constitute the venire, and (2)
 
 Batson
 
 does not apply to the dismissal of a venire. We have previously determined that the district court did not establish that the second venire was not randomly constituted, and we now determine that
 
 Batson
 
 does apply to challenges resulting in the dismissal of the venire.
 

 The United States Supreme Court recently decided
 
 Miller-El
 
 v.
 
 Dretke,
 
 which considered in its
 
 Batson
 
 analysis discrimination inherent in the Texas jury shuffle.
 
 [25]
 
 The Texas jury shuffle allows one party to reorganize the order of the jurors in the venire. Thus, the entire venire is affected, rather than individual jurors, and different jurors will be closer to serving on the jury. The Supreme Court held that the jury shuffle procedure, when used to discriminate by shuffling African-American jurors to the back of the venire, implicated the concerns of
 
 Batson.
 

 [26]
 

 Challenges resulting in the dismissal of the venire are no different. Changing venires in an attempt to obtain a venire with fewer African Americans is still
 
 *945
 
 discrimination that affects the makeup of the jury.
 
 Batson,
 
 therefore, is the appropriate vehicle to determine whether discrimination has occurred, not only during peremptory challenges but also at other stages of jury selection.
 

 In the present case, the State moved to dismiss the second venire, contending it was not randomly constituted since three African Americans sat in the first twelve spots of the venire. Similar to the Texas jury shuffle, the State used this objection to obtain a new jury with a different composition and order. This implicates the same concerns of discrimination present in
 
 Batson.
 
 We therefore conclude that
 
 Batson
 
 is applicable to this case.
 

 Williams ’ Batson challenge
 

 Batson
 
 provided a three-part test to determine whether discrimination occurred in jury selection. A defendant must first make a prima facie showing that discrimination based on race has occurred from the totality of the circumstances. Second, the burden shifts to the prosecution to give a race-neutral explanation for challenging the jurors. Finally, the district court has the duty to determine whether the defendant has established purposeful discrimination.
 
 [27]
 

 Williams met the first step of
 
 Batson
 
 by showing a racial motivation for the State’s actions. The State’s objection to the second venire involved the location of three African-American jurors in the first twelve spots of the venire.
 
 [28]
 
 The timing of the State’s objection is also revealing. The State was present in chambers when the court discussed the constitution of the next venire. The State did not lodge an objection to specific inclusion, a violation of the randomness requirement, at that time. Instead, the State waited until it was able to see the makeup of the second venire. Therefore, we conclude that Williams has met his burden of providing a prima facie showing of discrimination.
 

 
 *946
 
 The second step of
 
 Batson
 
 “ ‘does not demand an explanation that is persuasive, or even plausible,’ ”
 
 [29]
 
 but it does require that a discriminatory intent not be “ ‘inherent in the prosecutor’s explanation.’ ”
 
 [30]
 
 A court may look beyond the four corners of the case at hand to determine the prosecutor’s intent.
 
 [31]
 
 What is “inherent in the prosecutor’s explanation” is evident by examining the distinctions between
 
 Hernandez
 
 v.
 
 New
 
 York
 
 [32]
 
 and
 
 United States
 
 v.
 
 Bishop.
 

 [33]
 

 In
 
 Hernandez,
 
 the prosecutor exercised peremptory challenges to remove two bilingual jurors whose conduct during voir dire persuaded him that they might have difficulty accepting a translator’s rendition of what was said in Spanish as the testimony. The United States Supreme Court determined that this reason was sufficiently race-neutral, as opposed to a prosecutor removing the jurors simply because of their bilingual ability, which may inherently implicate race.
 
 [34]
 

 In contrast, the prosecutor in
 
 Bishop
 
 removed a juror because of her “residence, age, and employment.” However, the prosecutor did not remove other women jurors of the same age or a juror with the same occupation. The Ninth Circuit observed that when residence is used as a factor to remove a juror, then the prosecutor’s decision is inherently race-based and fails the second prong of
 
 Bat-son,
 

 [35]
 
 because a juror’s residence is a substitute for the juror’s probable race and stereotypes of experiences that can be ascribed to that race.
 

 In the present case, while the State did not have the opportunity to explain its actions in light of
 
 Batson,
 
 we cannot foresee any explanation that could purge the taint of its racial remarks. The State would have undoubtedly claimed that it was objecting to the lack of randomness. However, it did not do so until the racial makeup of the venire was revealed. It then specifically objected to the fact that three of the first twelve jurors were African Americans. It is plain that the State did not want a jury containing three or more African Americans.
 
 [36]
 
 We conclude that the State cannot offer any race-
 
 *947
 
 neutral reason to justify its opposition to the second venire. Because we conclude that the State cannot meet the second prong of
 
 Batson,
 
 we do not reach the third prong.
 

 Batson remedy
 

 The Supreme Court in
 
 Batson
 
 recognized that the remedy for
 
 Batson
 
 violations would vary from jury system to jury system and allowed the courts to fashion their own remedy.
 
 [37]
 
 One of the remedies often applied is discharging the venire and empanelling an entirely new one. In the present case, the district court did empanel a third venire. However, the third venire is not an appropriate remedy in this case.
 
 [38]
 

 In the usual case of a discriminatory peremptory challenge, the discriminatory effect is limited only to the jury and venire in the court at that time. Thus, when that venire is discharged, the discrimination is expunged and a new venire allows the parties to start anew without the discrimination.
 

 Unlike a peremptory challenge, the State here has not challenged one juror based on race, but the entire venire. Consequently, where an instance of discriminating against one juror may be resolved by a new venire, here the discrimination is not resolved by a new venire. The implication of discriminating against the entire venire is that the State does not like the makeup of the venire. Granting the State a new venire, one that it does not object to, means that it has successfully discriminated against the target class. Thus, the new venire is tainted by the discrimination. To hold that the subsequent venire remedied the discrimination would condone purposeful discrimination by the State.
 

 The third jury that Williams received is tainted by the State’s discriminatory action. Therefore, we reverse and remand to the district court for a new trial.
 

 Prior juvenile felony conviction
 

 Williams challenges the order of the district court admitting under NRS 50.095 his prior felony conviction for aggravated robbery because it was committed when he was a juvenile. NRS 50.095 permits the admission of a prior felony conviction to im
 
 *948
 
 peach a witness’s credibility, but only.if the crime was punishable by death or imprisonment for more than one year, and it has not been more than ten years since the witness’s release from prison or expiration of parole or probation.
 
 [39]
 
 Williams does not contest that his prior conviction resulted in a sentence of more than one year or that his final release from prison occurred within the ten-year period. However, Williams argues that his conviction was a juvenile conviction, which is inadmissible under NRS 50.095(4). We review the district court’s decision to admit evidence of a prior felony conviction for an abuse of discretion.
 
 [40]
 

 The district court denied Williams’ motion to exclude his conviction without addressing whether it was a juvenile conviction. The presentence report issued by the Nevada Department of Public Safety lists the offense as a juvenile offense. Williams was seventeen years old at the time of his conviction in an Arkansas circuit court. The record contains no other information regarding Williams’ prior conviction. Based on this evidence, we cannot conclusively determine that Williams’ prior conviction was an adult conviction.
 

 The State argues, however, that the district court did not err because “[j]uvenile adjudications
 
 normally
 
 do not involve ‘convictions’ and incarceration for a lengthy period of time in the state prison system.” However, whether juvenile adjudications in general do or do not
 
 normally
 
 involve convictions does not inform us as to whether
 
 this
 
 conviction was a juvenile adjudication. The State offers no Arkansas authority that this conviction is not a juvenile adjudication in that state.
 

 In this case, the State has not provided sufficient evidence to show that Williams’ conviction was an adult conviction. We therefore conclude that the district court abused its discretion in allowing Williams’ conviction to be used to impeach him.
 

 However, we will not overturn the judgment where an improperly admitted prior conviction was harmless error. In determining
 
 *949
 
 whether an error is harmless beyond a reasonable doubt,
 
 [41]
 
 we consider “whether the issue of innocence or guilt is close, the quantity and character of the error and the gravity of the harm charged.’ ’
 
 [42]
 

 In this case, the issue of innocence or guilt was closely disputed. The jury was required to gauge the credibility of the witnesses to determine whether to believe Swope’s or Williams’ version of the events. Williams’ prior conviction for aggravated robbery may have convinced the jury that he was not credible. Therefore, we conclude that the district court’s error was not harmless, and we reverse and remand this case for a new trial for this reason as well.
 

 CONCLUSION
 

 The district court erroneously instructed the jury commissioner to specifically include African-American jurors in the second jury venire when no constitutional violations had been proven. However, the district court did not establish that the jury commissioner complied with this instruction and that the constitution of that venire violated Nevada statutes. Absent a valid reason to dismiss the second jury venire, we conclude that the State’s motion to dismiss the venire violated
 
 Batson.
 
 We further conclude that the third venire was tainted by the
 
 Batson
 
 violation. We also conclude that the district court abused its discretion by allowing the State to impeach Williams with a juvenile conviction.
 

 Accordingly, we reverse the judgment of the district court and remand this matter to the district court for a new trial.
 

 Douglas and Parraguirre, JJ., concur.
 

 [1]
 

 A “venire” is defined in this opinion as the group of persons sent to the district court from which a jury is chosen. A “jury pool” is the entire group of persons called for jury service that day.
 

 [2]
 

 U.S. Census Bureau,
 
 Profile of General Demographic Characteristics
 
 (2000),
 
 available at
 
 http://censtats.census.gov/data/NV/05032003.pdf.
 

 [3]
 

 476 U.S. 79 (1986).
 

 [4]
 

 The district court erroneously termed this a
 
 Batson
 
 issue.
 

 [5]
 

 Evans
 
 v.
 
 State,
 
 112 Nev. 1172, 1186, 926 P.2d 265, 274 (1996).
 

 [6]
 

 Id.
 
 (quoting
 
 Taylor v. Louisiana,
 
 419 U.S. 522, 538 (1975)).
 

 [7]
 

 Id.
 
 at 1186, 926 P.2d at 275 (quoting
 
 Duren
 
 v.
 
 Missouri,
 
 439 U.S. 357, 364 (1979) (emphases added)).
 

 [8]
 

 Id.
 
 at 1187, 926 P.2d at 275.
 

 [9]
 

 The 2000 census indicates that the percentage of African Americans in Clark County, Nevada, is 9.1%. U.S. Census Bureau,
 
 supra
 
 note 2. Having one African American in a forty-person venire results in only 2.5% African Americans. Whether a certain percentage is a fair representation of a group is measured by the absolute and comparative disparity between the actual percentage in the venire and the percentage of the group in the community. The absolute disparity is 6.6%. This is not a large percentage. But if 6.6% is compared with the actual percentage of African Americans in Clark County, 9.1%, the comparative disparity is 72.5%. Comparative disparities over 50% indicate that the representation of African Americans is likely not fair and reasonable.
 
 See Evans,
 
 112 Nev. at 1187, 926 P.2d at 275.
 

 [10]
 

 366 F.2d 1, 23-24 (5th Cir. 1966).
 

 [11]
 

 Id.
 
 at 5.
 

 [12]
 

 Id.
 
 at 9.
 

 [13]
 

 The first venire had one African American out of forty veniremembers, the second venire had six African Americans, and the third venire had three African Americans.
 

 [14]
 

 Editorial,
 
 Question cf Fairness Lingers,
 
 Las Vegas Sun, Nov. 8, 2005,
 
 available at
 
 http: //www. lasvegassun. com/sunbin/stories/sun/2005/nov/08/ 519628064.html?questions%20of%20fairness%201ingers; Editorial,
 
 Jury Pools Are Shallow,
 
 Las Vegas Sun, Nov. 1, 2005,
 
 available at
 
 http://www.lasvegassun.com/sunbin/stories/sun/2005/nov/01/519594545.html? jury%20pools%20are%20shallow; Matt Pordum,
 
 The Jury’s Still Out,
 
 Las Vegas Sun, Oct. 30, 2005,
 
 available at
 
 http://www.lasvegassun.com/ sunbin/stories/sun/2005/oct/30/519585122.html?the%20jury’s%20still%20out.
 

 [15]
 

 Pordum,
 
 supra
 
 note 14.
 

 [16]
 

 Brooks,
 
 366 F.2d at 23.
 

 [17]
 

 The minority racial profile of Clark County, Nevada, in the 2000 census included American Indian (0.8%), Asian (5.3%), Black or African American (9.1%), and Hispanic or Latino (22%). U.S. Census Bureau,
 
 supra
 
 note 2.
 

 [18]
 

 Without an awareness of the makeup of the lists used to select the jury pool or the actual jury pool itself, a jury commissioner cannot adequately determine whether the jury pool or the jury lists reflect a fair cross section of the community. If the jury list does not produce jury pools that reflect a fair cross section of the community, then the jury commissioner should use more lists than mandated by statute.
 
 E.g.,
 
 NRS 6.010. In 2002, the Nevada Jury Improvement Commission recommended that at least three source lists be used 'to constitute jury pools. Jury Improvement Commission,
 
 Report of the Supreme Court of Nevada
 
 10 (2002),
 
 available at
 
 http://www.nvsupremecourt.us/ DOCS/reports/rpt_0210_jury.PDF. We do not hold at this time that being unaware of the composition of the jury pool is unconstitutional. We do, however, .observe that without knowledge of the composition of the jury pool and jury lists, an assertion that they provide juries comprising a fair cross section of the community is mere speculation.
 

 [19]
 

 We leave unanswered the question of whether specific inclusion would be an appropriate remedy where a district court first determines that a constitutional violation has occurred.
 

 [20]
 

 Daniels
 
 v.
 
 State,
 
 114 Nev. 261, 270, 956 P.2d 111, 116 (1998).
 

 [21]
 

 E.g., Brooks
 
 v.
 
 Beto,
 
 366 F.2d 1, 23-24 (5th Cir. 1966).
 

 [22]
 

 NRS 6.045; NRS 6.090.
 

 [23]
 

 State
 
 v.
 
 Echineque,
 
 828 P.2d 276, 279 (Haw. 1992).
 

 [24]
 

 476 U.S. 79 (1986).
 

 [25]
 

 545 U.S. 231, 253-55 (2005).
 

 [26]
 

 Id.
 

 [27]
 

 476 U.S. at 96-98;
 
 Foster
 
 v.
 
 State,
 
 121 Nev. 165, 171-72, 111 P.3d 1083, 1088 (2005).
 

 [28]
 

 From the trial transcripts:
 

 Our objection, Judge, is to the . . . random nature of this reconstituted second jury venire. . . . That is our objection, not as to the fact that there were six. There could have been seven, there could have been ten. We'just don’t feel that it was random.
 
 We had three African-Americans in the first twelve. And we had talked about in chambers that we thought that normally it’s around three to five, and all of a sudden we had six and we had three in the first twelve.
 
 So, . . . we feel that it wasn’t completely random, therefore we are asking for a more random selection tomorrow, which would be a fresh start.
 

 (Emphasis added.)
 

 [29]
 

 Kaczmarek v. State,
 
 120 Nev. 314, 333, 91 P.3d 16, 29 (2004) (quoting
 
 Purkett v. Elem,
 
 514 U.S. 765, 768 (1995)).
 

 [30]
 

 U.S. v. Bishop,
 
 959 F.2d 820, 827 (9th Cir. 1992) (quoting
 
 Hernandez v. New York,
 
 500 U.S. 352, 360 (1991) (plurality opinion));
 
 Kaczmarek,
 
 120 Nev. at 333, 91 P.3d at 29 (quoting
 
 Hernandez,
 
 500 U.S. at 360).
 

 [31]
 

 Miller-El,
 
 545 U.S. at 240.
 

 [32]
 

 500 U.S. 352.
 

 [33]
 

 959 F.2d 820.
 

 [34]
 

 Hernandez,
 
 500 U.S. at 360-61.
 

 [35]
 

 Bishop,
 
 959 F.2d at 825-27.
 

 [36]
 

 While the State contended that the venire was not selected in a random manner, its overriding concern was the racial makeup and positioning of
 
 *947
 
 African-American jurors within the venire. Without evidence that the venire was in fact not random, we can only conclude that the State’s concern with randomness was a pretext for discrimination.
 

 [37]
 

 476 U.S. at 99 n.24.
 

 [38]
 

 Reinstating the jury members is not an appropriate remedy either, as the jury members were all dismissed.
 

 [39]
 

 NRS 50.095 provides in relevant part:
 

 1. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible but only if the crime was punishable by death or imprisonment for more than 1 year under the law under which he was convicted.
 

 2. Evidence of a conviction is inadmissible under this section if a period of more than 10 years has elapsed since:
 

 (a) The date of the release of (he witness from confinement; or
 

 (b) The expiration of the period of his parole, probation or sentence, whichever is the later date.
 

 4. Evidence of juvenile adjudications is inadmissible under this section.
 

 [40]
 

 Pineda
 
 v.
 
 State,
 
 120 Nev. 204, 210, 88 P.3d 827, 832 (2004).
 

 [41]
 

 Richmond
 
 v.
 
 State,
 
 118 Nev. 924, 934, 59 P.3d 1249, 1255-56 (2002).
 

 [42]
 

 Weakland v. State,
 
 96 Nev. 699, 701, 615 P.2d 252, 254 (1980).