135 Nev., Advance Opinion 62

# IN THE SUPREME COURT OF THE STATE OF NEVADA

KEANDRE VALENTINE,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 74468

**FILED**

DEC 19 2019

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of seven counts of robbery with the use of a deadly weapon, three counts of burglary while in possession of a deadly weapon, two counts of possession of credit or debit card without cardholder's consent, and one count each of attempted robbery with the use of a deadly weapon and possession of document or personal identifying information for the purpose of establishing a false status or identity. Eighth Judicial District Court, Clark County; Richard Scotti, Judge.

*Vacated and remanded.*

Darin F. Imlay, Public Defender, and Sharon G. Dickinson, Deputy Public Defender, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Krista D. Barrie, Chief Deputy District Attorney, and Michael R. Dickerson, Deputy District Attorney, Clark County,
for Respondent.

BEFORE HARDESTY, STIGLICH and SILVER, JJ.

19-51314

*OPINION*

By the Court, STIGLICH, J.:

A defendant has the right to a jury chosen from a fair cross section of the community, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. This court has addressed the showing a defendant must make to establish a prima facie violation of this right. We have said little, however, about when an evidentiary hearing may be warranted on a fair-cross-section claim. Faced with that issue in this case, we hold that an evidentiary hearing is warranted on a fair-cross-section challenge when a defendant makes specific allegations that, if true, would be sufficient to establish a prima facie violation of the fair-cross-section requirement. Because the defendant in this matter made specific factual allegations that could be sufficient to establish a prima facie violation of the fair-cross-section requirement and those allegations were not disproved, the district court abused its discretion by denying Valentine's request for an evidentiary hearing. None of Valentine's other claims warrant a new trial. We therefore vacate the judgment of conviction and remand for further proceedings as to the fair-cross-section challenge.

*BACKGROUND*

Appellant Keandre Valentine was convicted by a jury of multiple crimes stemming from a series of five armed robberies in Las Vegas, Nevada. Before trial, Valentine objected to the 45-person venire and claimed a violation of his right to a jury selected from a fair cross section of the community. He argued that two distinctive groups in the community—African Americans and Hispanics—were not fairly and reasonably represented in the venire when compared with their representation in the community. Valentine asserted that the underrepresentation was caused by systematic exclusion, proffering two theories as to how the system used



in Clark County excludes distinctive groups. His first theory was that the system did not enforce jury summonses; his second theory was that the system sent out an equal number of summonses to citizens located in each postal ZIP code without ascertaining the percentage of the population in each ZIP code. Valentine requested an evidentiary hearing, which was denied. The district court found that the two groups were distinctive groups in the community and that one group—Hispanics—was not fairly and reasonably represented in the venire when compared to its representation in the community. However, the district court found that the underrepresentation was not due to systematic exclusion, relying on the jury commissioner's testimony regarding the jury selection process two years earlier in another case and on this court's resolution of fair-cross-section claims in various unpublished decisions. The court thus denied the constitutional challenge.

## DISCUSSION

*Fair-cross-section challenge warranted an evidentiary hearing*

Valentine claims the district court committed structural error by denying his fair-cross-section challenge without conducting an evidentiary hearing. We review the district court's denial of Valentine's request for an evidentiary hearing for an abuse of discretion. *See Berry v. State*, 131 Nev. 957, 969, 363 P.3d 1148, 1156 (2015) (reviewing denial of request for an evidentiary hearing on a postconviction petition for a writ of habeas corpus); *accord United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (reviewing denial of request for an evidentiary hearing on a motion to dismiss an indictment); *United States v. Terry*, 60 F.3d 1541, 1544 n.2 (11th Cir. 1995) (reviewing denial of request for an evidentiary hearing on fair-cross-section challenge to statute exempting police officers from jury service).

"Both the Fourteenth and the Sixth Amendments to the United States Constitution guarantee a defendant the right to a trial before a jury selected from a representative cross-section of the community." *Evans v. State*, 112 Nev. 1172, 1186, 926 P.2d 265, 274 (1996). While this right does not require that the jury "mirror the community and reflect the various distinctive groups in the population," it does require "that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 1186, 926 P.2d at 274-75 (internal quotation marks omitted). "Thus, as long as the jury selection process is designed to select jurors from a fair cross section of the community, then random variations that produce venires without a specific class of persons or with an abundance of that class are permissible." *Williams v. State*, 121 Nev. 934, 940, 125 P.3d 627, 631 (2005).

A defendant alleging a violation of the right to a jury selected from a fair cross section of the community must first establish a prima facie violation of the right by showing

> (1) that the group alleged to be excluded is a *"distinctive" group* in the community; (2) that the *representation of this group in venires* from which juries are selected *is not fair and reasonable* in relation to the number of such persons in the community; and (3) that this underrepresentation is *due to systematic exclusion* of the group *in the jury-selection process.*

*Evans*, 112 Nev. at 1186, 926 P.2d at 275 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). To determine "[w]hether a certain percentage is a fair representation of a group," this court uses "the absolute and comparative disparity between the actual percentage in the venire and the percentage of the group in the community." *Williams*, 121 Nev. at 940 n.9,

125 P.3d at 631 n.9. And to determine whether systematic exclusion has been shown, we consider if the underrepresentation of a distinctive group is "inherent in the particular jury-selection process utilized." *Evans*, 112 Nev. at 1186-87, 926 P.2d at 275 (internal quotation marks omitted). Only after a defendant demonstrates a prima facie violation of the right does "the burden shift[ ] to the government to show that the disparity is justified by a significant state interest." *Id.* at 1187, 926 P.2d at 275.

Here, Valentine asserted that African Americans and Hispanics were not fairly and reasonably represented in the venire. Both African Americans and Hispanics are recognized as distinctive groups. *See id.*; *see also United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996). And the district court correctly used the absolute and comparative disparity between the percentage of each distinct group in the venire and the percentage in the community to determine that African Americans were fairly and reasonably represented in the venire but that Hispanics were not. *See Williams*, 121 Nev. at 940 n.9, 125 P.3d at 631 n.9 ("Comparative disparities over 50% indicate that the representation of [a distinct group] is likely not fair and reasonable."). The district court denied Valentine's challenge as to Hispanics based on the third prong—systematic exclusion.

We conclude the district court abused its discretion in denying Valentine's request for an evidentiary hearing. Although this court has not articulated the circumstances in which a district court should hold an evidentiary hearing when presented with a fair-cross-section challenge, it has done so in other contexts. For example, this court has held that an evidentiary hearing is warranted on a postconviction petition for a writ of habeas corpus when the petitioner has "assert[ed] claims supported by specific factual allegations [that are] not belied by the record [and] that, if true, would entitle him to relief." *Mann v. State*, 118 Nev. 351, 354, 46 P.3d

1228, 1230 (2002); *see also Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984). Most of those circumstances are similarly relevant when deciding whether an evidentiary hearing is warranted on a defendant's fair-cross-section challenge, given the defendant's burden of demonstrating a prima facie violation. In particular, it makes no sense to hold an evidentiary hearing if the defendant makes only general allegations that are not sufficient to demonstrate a prima facie violation or if the defendant's specific allegations are not sufficient to demonstrate a prima facie violation as a matter of law. *See Terry*, 60 F.3d at 1544 n.2 (explaining that no evidentiary hearing is warranted on a fair-cross-section challenge if no set of facts could be developed that "would be significant legally"). But unlike the postconviction context where the claims are case specific, a fair-cross-section challenge is focused on systematic exclusion and therefore is not case specific. Because of that systematic focus, it makes little sense to require an evidentiary hearing on a fair-cross-section challenge that has been disproved in another case absent a showing that the record in the prior case is not complete or reliable.[1] With these considerations in mind, we hold that an evidentiary hearing is warranted on a fair-cross-section challenge when a defendant makes specific allegations that, if true, would be sufficient to establish a prima facie violation of the fair-cross-section requirement.[2]

---

[1]For the reasons stated herein, it was error for the district court to rely upon the jury commissioner's prior testimony in denying Valentine's challenge. That is not to say a district court may never rely upon prior testimony when appropriate.

[2]We note that, in order to meet the burden of demonstrating an evidentiary hearing is warranted, a defendant may subpoena supporting

SUPREME COURT
OF
NEVADA

(O) 1947A

6

Applying that standard, we conclude that Valentine was entitled to an evidentiary hearing as to his allegation of systematic exclusion of Hispanics. Valentine did more than make a general assertion of systematic exclusion. In particular, Valentine made specific allegations that the system used to select jurors in the Eighth Judicial District Court sends an equal number of jury summonses to each postal ZIP code in the jurisdiction without ascertaining the percentage of the population in each ZIP code. Those allegations, if true, could establish underrepresentation of a distinctive group based on systematic exclusion. *Cf. Garcia-Dorantes v. Warren*, 801 F.3d 584, 591-96 (6th Cir. 2015) (discussing a prima facie case of systematic exclusion where a computer used a list to determine the percentage of jurors per ZIP code, but because of a glitch, the list included a higher number of persons from certain ZIP codes that had smaller proportions of African Americans than the community at large). And those allegations were not addressed in the jury commissioner's prior testimony that the district court referenced.[3] Accordingly, the district court could not

---

documents and present supporting affidavits. *See Hargrove*, 100 Nev. at 502-03, 686 P.2d at 225.

[3]Even if the jury commissioner's previous testimony addressed Valentine's specific allegations of systematic exclusion, reliance on the old testimony would have been misplaced. In particular, the prior testimony mentioned that the system was "moving towards a new improved jury selection process" and legislative amendments regarding the juror selection process were implemented close in time to Valentine's trial. *See* 2017 Nev. Stat., ch. 549, §§ 1-5, at 3880-84. While prior testimony relevant to a particular fair-cross-section challenge may obviate the need for an evidentiary hearing, a district court should be mindful that it not rely upon stale evidence in resolving such challenges.

rely on the prior testimony to resolve Valentine's allegations of systematic exclusion. Having alleged specific facts that could establish the underrepresentation of Hispanics as inherent in the jury selection process, Valentine was entitled to an evidentiary hearing.[4] Accordingly, the district court abused its discretion by denying Valentine's request for an evidentiary hearing.[5] We therefore vacate the judgment of conviction and remand to the district court for an evidentiary hearing. *Cf. State v. Ruscetta*, 123 Nev. 299, 304-05, 163 P.3d 451, 455 (2007) (vacating judgment of conviction and remanding where district court failed to make factual findings regarding motion to suppress and where record was insufficient for appellate review). Thereafter, Valentine's fair-cross-section challenge should proceed in the manner outlined in *Evans*, 112 Nev. at 1186-87, 926 P.2d at 275. If the district court determines that the challenge lacks merit, it may reinstate the judgment of conviction, except as provided below.

*Sufficiency of the evidence*

Valentine argues the State presented insufficient evidence to support his convictions for robbery with the use of a deadly weapon in counts 4 and 9. In considering a claim of insufficient evidence, we "view[ ] the evidence in the light most favorable to the prosecution" to determine

---

[4]It is unclear that Valentine's allegations regarding the enforcement of jury summonses would, if true, tend to establish underrepresentation as a result of systematic exclusion. *See United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."). Accordingly, he was not entitled to an evidentiary hearing as to those allegations.

[5]We reject Valentine's contention that the district court's failure to hold an evidentiary hearing evinced judicial bias resulting in structural error.

whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

> NRS 200.380(1) defines the crime of robbery as
>
> [T]he unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person or property, or the person or property of a member of his or her family, or of anyone in his or her company at the time of the robbery.[6]

Additionally, we have held that the State must show that the victim had possession of or a possessory interest in the property taken. *See Phillips v. State*, 99 Nev. 693, 695-96, 669 P.2d 706, 707 (1983).

The challenged robbery counts stem from a similar fact pattern. Beginning with count 4, Valentine was charged with robbing Deborah Faulkner of money; Valentine was also charged with robbing Darrell Faulkner, Deborah's husband, of money in count 3. Valentine was convicted of both counts. However, when viewed in a light most favorable to the prosecution, the evidence produced at trial was insufficient to support a robbery charge as it related to Deborah. While the evidence established that Valentine took $100 that Darrell removed from his own wallet, the evidence demonstrated that Valentine demanded Deborah to empty her

---

[6]The Legislature amended NRS 200.380, effective October 1, 2019. 2019 Nev. Stat., ch. 76, § 1, at 408. While the amendments do not affect our analysis in this matter, we have quoted the pre-amendment version of NRS 200.380 that was in effect at the time of the events underlying this appeal. 1995 Nev. Stat., ch. 443, § 60, at 1187.

 

purse onto the ground but actually took nothing from it. There was no evidence that Deborah had possession of, or a possessory interest in, the money from Darrell's wallet.[7] Thus, the State presented insufficient evidence for count 4, and the conviction for that count cannot be sustained.

Similarly, in count 9, Valentine was charged with robbing Lazaro Bravo-Torres of a wallet and cellular telephone; Valentine was also charged with robbing Rosa Vasquez-Ramirez, Lazaro's wife, of a purse, wallet, and/or cellular telephone in count 11. Valentine was convicted of both counts. Yet viewing the evidence in a light most favorable to the prosecution, the evidence did not establish that Valentine robbed Lazaro. Specifically, Lazaro testified that he told Valentine he did not have cash or a wallet on him and that his phone, located in the center compartment of the truck, was not taken but was used by the couple after the incident was over. Conversely, Rosa testified that Valentine took her purse along with the items in it. The evidence presented by the State did not establish that Lazaro had possession of, or a possessory interest in, the items taken,[8] and thus the conviction for count 9 cannot be sustained.

*Prosecutorial misconduct regarding DNA evidence*

Valentine contends that the State engaged in prosecutorial misconduct during closing argument when discussing the deoxyribonucleic acid (DNA) evidence. In considering a claim of prosecutorial misconduct,

---

[7]We are unconvinced by the State's argument that the singular fact of Darrell and Deborah being married, without more, demonstrated that the money in Darrell's wallet was community property of the marriage such that Deborah had a possessory interest in it. *See* NRS 47.230(3).

[8]We again reject the State's argument that the mere fact that Lazaro and Rosa were married demonstrated that Lazaro had a possessory interest in Rosa's purse or the items therein. *See id.*

we determine whether the conduct was improper and, if so, whether the improper conduct merits reversal. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008).

During the trial, the State presented an expert witness to testify about the DNA results from a swab of the firearm found in the apartment where Valentine was discovered. The expert testified generally about the procedures her laboratory uses for DNA analysis. She explained that samples are tested at the same 15 locations, or loci, on the DNA molecule and a DNA profile results from the alleles, or numbers, obtained from each of the 15 locations.[9] When complete information from each of the 15 locations is obtained, the result is a full DNA profile; anything less produces a partial DNA profile. The results of the DNA testing process appear as peaks on a graph, and it is those peaks that the expert interprets and uses to make her determinations. In considering the information on a graph, the expert indicated that her laboratory uses a threshold of 200— anything over 200 is usable information, while anything below 200 is not used "because it's usually not reproducible dat[a]," meaning if the sample was tested again, "it's so low that [she] might get that same information, [she] might not."[10] The expert maintained that sometimes DNA information is obtained "but it's not good enough for us to make any determinations on. So in that case we call it inconclusive."

---

[9]The expert added that her laboratory also looks at an additional location, the amelogenin, in order to determine the gender of the individual represented in the sample.

[10]The expert also testified that anything below 40 indicated that there was no actual DNA profile. She explained that her laboratory uses the thresholds "to make sure that when we say that there is a good, usable DNA profile, that it's actually a good, useable DNA profile."

SUPREME COURT
OF
NEVADA

(O) 1947A

11

As to the results of the swab from the firearm, the expert testified that she "did not obtain a useable profile, so there was no comparison made." She stated that the laboratory thresholds were not met and thus "the profile was inconclusive." The only conclusion the expert was able to make was that the partial DNA profile obtained from the firearm swab was consistent with a mixture of at least two persons and that at least one of the persons was male.

During the expert's testimony, the State offered three exhibits: one was a summary, side-by-side comparative table of the DNA information collected from the firearm swab and from Valentine; and two were graphs of the specific information collected from the firearm swab and Valentine, both graphs showing peaks of information alongside a scale indicating the laboratory's threshold limits. Valentine objected to the admission of the graphs, arguing that they could be confusing to the jury, that the jurors should not be drawing their own conclusions from the graphs, and that he did not want the jurors to think they could discern something from the graphs that the expert could not. The district court overruled Valentine's objection, finding the graphs relevant to the expert's methodology and reliability.[11]

Regarding the summary, side-by-side table, the expert testified that every tested location of the firearm swab, save for the location used to

---

[11]Valentine argues the district court abused its discretion in admitting the graphs. We cannot say the admission of the graphs to show methodology and reliability was an abuse of discretion. But while the graphs may have been relevant for such purposes, the manner in which the information was used by the State, as discussed below, strongly undermined the district court's reasoning for admitting the evidence. *See* NRS 47.110 (discussing the limited admissibility of evidence and, upon request, the need for an instruction to restrict the jury's consideration to the proper scope).

determine gender, resulted in either an "NR," meaning no DNA profile was obtained from that particular location, or an asterisk, indicating information was present but "it was so low that [she was] not even going to do any comparisons or say anything."

Regarding the graphs, the State went through the tested locations of the firearm swab and, while continuously commenting that the results were below the laboratory's 200 threshold, asked the expert to identify the alleles for which there were peaks of information. In going through the peaks of information from the firearm swab, the State also intermittently mentioned the corresponding locations and, ostensibly matching, alleles found in Valentine's DNA profile. During cross-examination, the expert repeated the 200 threshold and explained that she does not look at information below that threshold, even if it is close, because it could be incorrect. Valentine asked the expert if she had anything she wanted to add in response to the State's line of questioning regarding each of the locations tested, and the expert reiterated the following:

> [T]he profile [from the firearm swab] was inconclusive, and we call it inconclusive because there wasn't enough DNA. . . . [A]nd we call that inconclusive . . . because if I re-ran that exact same sample, I don't know what kind of results I would come up with. It may be the same, it may be different. So that's why we're not saying that the DNA profile definitely came from the defendant, because it's inconclusive to me.
>
> . . . .
>
> [The thresholds] exist for a reason.
>
> . . . .
>
> Because we don't want to present information that may not be correct or overemphasize something, you know, saying yes, this person is there, when it may not be true because our data is

Supreme Court
of
Nevada

(O) 1947A

13

not supporting that it's a strong DNA profile. So we want to be sure when we say there's a match, that it is, in fact, a match.

We don't want to make the wrong conclusions on the item that we're looking at.

. . . .

Despite the expert's testimony, the State pointed to the two graphs and argued that the jurors could assess for themselves whether Valentine's DNA profile matched the DNA profile from the firearm swap. During closing argument, the State made the following comments:

> You heard about the DNA evidence in this case. Now, the scientist came in. She told you she could not make any results. The results that she had for the swab of the gun were below the threshold. But we went through every single one. *And that's something you need to also take a look at when you go back there, just to see what you think for yourself.* When we went through and looked at the items *below the 200 threshold*, but above the 40 threshold *this is what we found.* We found that the swab of the handgun revealed a 12 and a 13 allele. Mr. Valentine, a 12 and a 13 allele. The swab also [had] a 28 allele on the next [location]. A 28 allele on that same [location] for Mr. Valentine.

(Emphases added.) Valentine objected and argued that the State's own expert said that such a comparison was improper. The district court overruled the objection, finding the prosecutor was merely arguing that some weight should be given to the evidence and stating it was up to the jury to decide the weight to give the evidence. The State continued:

> [I]t's worth taking into consideration. You are here for two weeks. Look at all the evidence. This is part of the evidence. You heard that under each [location] there is a number of alleles. And here, though, yeah, maybe the threshold is under 200,

SUPREME COURT
OF
NEVADA

(O) 1947A

14

*there's something here. But just consider for yourself.*

Next, we have the [location] on the swab of the handgun, 15 and 16. Mr. Valentine also at 15 and 16. Next [location] at 7; Mr. Valentine also at 7. Next [location] at 12 and 13; Mr. Valentine also at 12 and 13. So on and so forth, *matching*.

. . . .

Ladies and gentlemen, it's just worth considering. Take a look at it. *See what you think. Make your own determination.*[12]

(Emphases added.)

Without reservation, we conclude the prosecutor's closing argument was improper. "[A] prosecutor may argue inferences from the evidence and offer conclusions on contested issues" during closing argument, but "[a] prosecutor may not argue facts or inferences not supported by the evidence." *Miller v. State*, 121 Nev. 92, 100, 110 P.3d 53, 59 (2005) (internal quotation marks omitted). Here, the State presented an

---

[12]In his closing argument, Valentine attempted to rebut the State's presentation of the evidence:

The DNA analysis, she seemed to really know her stuff. State's expert. They put her on. What did she testify to? Well, she testified to a lot with the State and she looked extremely uncomfortable, which was clarified on cross that, a lot of this, well, the peaks, there's a little bit of peak that sort of matches him. She was very uncomfortable about that because as she said on cross, that's not how it works. It's not reliable under a certain level. They can't say inside—for scientific certainty that it's even possible. It's even plausible, because they might get totally different results if they run it again. That's why she was uncomfortable testifying to that.

 

expert witness to testify as to the DNA results obtained from the swab of the firearm. *See United States v. McCluskey*, 954 F. Supp. 2d 1224, 1253 (D.N.M. 2013) ("[J]urors can understand and evaluate many types of evidence, but DNA evidence is different and a prerequisite to its admission is technical testimony from experts to show that correct scientific procedures were followed." (internal quotation marks omitted)). The purpose of expert testimony "is to provide the trier of fact [with] a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." *Townsend v. State*, 103 Nev. 113, 117, 734 P.2d 705, 708 (1987); *see also* NRS 50.275 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify to matters within the scope of such knowledge."). But after presenting its expert to testify about a subject outside the ordinary range of knowledge for jurors, the State disregarded that testimony and invited the jury to make inferences that the expert testified were not supported by the DNA evidence. The State asked the jury to consider evidence about which the expert was emphatic she could make no conclusions, save for her overall conclusion that the evidence was consistent with a mixture of at least two persons, at least one of whom was male. The State then asked the jury to compare the unusable profile to Valentine's DNA profile. This is precisely what the expert said she could not do because it would be unreliable. *See Hallmark v. Eldridge*, 124 Nev. 492, 500, 189 P.3d 646, 651 (2008) (holding that expert witness "testimony will assist the trier of fact only when it is relevant and the product of reliable methodology" (footnote omitted)). No evidence was introduced, statistical or otherwise, regarding the significance or meaning of the data that fell below the 200 threshold. To the contrary, the only evidence presented was that such information produced an unusable profile and was not considered

SUPREME COURT
OF
NEVADA

(O) 1947A

16

by the expert. It is hard to imagine what weight could be ascribed to evidence that was described only as inconclusive, unusable, and incomparable. Rather, the State's use of the expert's testimony can better be viewed as taking advantage of the "great emphasis" or the "status of mythic infallibility" that juries place on DNA evidence. *People v. Marks*, 374 P.3d 518, 525 (Colo. App. 2015) (internal quotation marks omitted). Simply put, the prosecution argued facts not in evidence and inferences not supported by the evidence. This was improper.

We nevertheless conclude that the improper argument would not warrant reversal of Valentine's convictions because it did not substantially affect the jury's verdict. *See Valdez*, 124 Nev. at 1188-89, 196 P.3d at 476. There was evidence presented that Valentine handled the gun and multiple victims identified Valentine as the perpetrator. Thus, the error was harmless, and Valentine is not entitled to a new trial based on the prosecutorial misconduct.[13]

## *CONCLUSION*

The district court abused its discretion in denying Valentine's request for an evidentiary hearing on his fair-cross-section challenge. We therefore vacate the judgment of conviction and remand for the district court to conduct an evidentiary hearing and resolve the fair-cross-section challenge. None of Valentine's other arguments require a new trial. Accordingly, if the district court determines on remand that the fair-cross-section challenge lacks merit, it may reinstate the judgment of conviction

---

[13]We have considered Valentine's remaining contentions of error and conclude no additional relief is warranted.

except as to the convictions for counts 4 and 9, which were not supported by sufficient evidence.[14]

_____, J.
Stiglich

We concur:

_____, J.
Hardesty

_____, J.
Silver

_____

[14]This opinion constitutes our final disposition of this appeal. Any future appeal following remand shall be docketed as a new matter.